



**CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON
THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 3, 2022**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **PLACID OIL COMPANY,** | § | **Case No. 86-33419-sgj-11** |
| | § | |
| Debtor. | § | **Chapter 11** |
| _____ | § | |
| | § | |
| **PLACID OIL LLC, F/K/A PLACID OIL COMPANY** | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **Adversary Proc. No. 20-03149-sgj** |
| | § | |
| **AVALON FARM, INC., F/K/A AVALON PLANTATION, INC.** | § | |
| | § | |
| | § | |
| Defendant. | | |

**MEMORANDUM OPINION AND ORDER[1]: (A) GRANTING MOTION FOR SUMMARY JUDGMENT OF AVALON FARM, INC.; (B) DENYING MOTION FOR SUMMARY JUDGMENT OF PLACID OIL, LLC; AND (C) DECLARING THAT CLAIMS OF AVALON FARM, INC., IF ANY, AGAINST PLACID OIL, LLC RELATING TO THAT CERTAIN 20-ACRE SURFACE LEASE IN ST. MARY PARISH, LOUISIANA WERE NOT DISCHARGED IN THE CHAPTER 11 BANKRUPTCY CASE OF PLACID OIL COMPANY[2]**

## I.    INTRODUCTION

Before this court are cross motions for summary judgment filed by both the plaintiff (the "Placid MSJ") and defendant (the "Avalon MSJ"), along with responses thereto, replies thereto, post-hearing briefing (collectively consisting of hundreds of pages), plus supporting summary judgment appendices (a few thousand pages more) filed in the above-referenced adversary proceeding (the "Adversary Proceeding").

The plaintiff, Placid Oil, LLC, formerly known as Placid Oil Company ("Placid" or the "Reorganized Debtor"), filed a Chapter 11 bankruptcy case in 1986. Placid filed this Adversary Proceeding more than three decades after confirmation of its Chapter 11 plan of reorganization (the "Plan") and closure of its bankruptcy case (the "Bankruptcy Case"). Placid seeks a determination that certain environmental contamination claims now being asserted against it in a Louisiana state court by the defendant Avalon Farm, Inc., formerly known as Avalon Plantation, Inc. ("Avalon"), were discharged by Placid's Plan and the long-final confirmation order (the "Confirmation Order"). Avalon seeks the opposite ruling—that its claims (at least those relating to a certain 20-acre surface lease in St. Mary Parish, Louisiana) were not discharged, due to a lack of actual notice of the Bankruptcy Case, the bar date(s) for filing claims, the Plan, and the Confirmation Order.

---

[1] This Memorandum Opinion and Order is issued pursuant to Federal Rule of Bankruptcy Procedure 7056.
[2] Avalon's Motion for Summary Judgment alternatively asks for discretionary abstention by this court in this adversary proceeding, pursuant to 28 U.S.C. § 1334(c). The request for abstention is denied, because the court believes it is both legally permissible and in the interest of judicial economy to give the parties a ruling on the merits.

Notably, similar adversary proceedings have been filed in the past in this reopened Chapter 11 Bankruptcy Case—as Placid was a large, international player in the energy industry and has been a target-defendant in many post-confirmation lawsuits over the years. These post-confirmation lawsuits have asserted everything from asbestos liability (i.e., in situations in which mesothelioma manifested in a person decades after an alleged exposure to asbestos at a Placid property) to environmental contamination claims, pertaining to activities that occurred throughout many decades—with arguments being made by claimants, that: (a) their newly asserted claims were *future* claims at the time of the Bankruptcy Case and not discharged by the Plan; or alternatively, (b) even if their claims were *existing* claims at the time the Bankruptcy Case was filed, the claims were not discharged because the claimants were given *no actual notice* of the bar date for filing claims in the Bankruptcy Case. In each of these prior situations, the bankruptcy court has agreed with Placid (as have courts of appeal) that: (a) the newly asserted claims were prepetition claims (not future claims), because there was a prepetition relationship or conduct involving the claimants and Placid; (b) the claims were "unknown" to Placid (i.e., Placid had no specific information about a manifested injury of these creditors whose identities were not reasonably ascertainable) at the time of the Bankruptcy Case; and (c) "unknown" creditors are not entitled to *actual* notice but, rather, mere *constructive* notice, through a publication notice regarding the bar date in the Bankruptcy Case. Such publication notice of the prepetition bar date occurred in this Bankruptcy Case through the WALL STREET JOURNAL. Thus, in all prior situations before this court, the court has held that—since there was a publication notice, and, since no proofs of claim were filed by the complaining claimants—their claims were discharged by the Plan.[3]

---

[3] *See Williams v. Placid Oil Co. (In re Placid Oil Co.)*, 753 F.3d 151 (5th Cir. 2014); *Placid Oil Co. v. Shelton Property Rural Acreage, LLC*, 450 Fed. Appx. 323 (5th Cir. 2011) and *Placid Oil Company v. Cavenham Forest Industries, Inc.*, 3:94-CV-2460-H (N.D. Tex. October 31, 1995).

*However, the situation currently before the court is different*.  Avalon (actually its predecessor-in-interest) was in contractual privity with Placid *before and during the Bankruptcy Case*, as will be explained in detail below.  Specifically, Avalon's predecessor-in-interest was a lessor on an unexpired lease of real property (i.e., a surface lease; not a mineral lease) on which Placid was a lessee, by virtue of an assignment.  This lease will henceforth be referred to as the "20-Acre Surface Lease."  Placid either *assumed* the 20-Acre Surface Lease in its Plan—without giving Avalon's predecessor actual notice of same—or, alternatively, let it "*ride through*" the bankruptcy unaffected.  These two possibilities—assumption or "ride through"—are the only two possibilities here since, it is undisputed, Placid continued operating on the 20-Acre Surface Lease post-confirmation.  While the parties spilled much ink arguing about whether Avalon's predecessor-in-interest was a "known" or "unknown" creditor, and whether the claims Avalon is now asserting constitute prepetition, postpetition, or post-confirmation claims, this ultimately misses the mark.  *This is ultimately a case about an unexpired lease of real property on which Placid was a party at the time of the Bankruptcy Case*.  A "claim" only arises from the *rejection* of an unexpired lease or executory contract.[4]  If an unexpired lease is proposed to be *assumed* by a debtor-in-possession, the lessee has no "claim," *per se*.[5]  Rather, any defaults or pecuniary losses existing under an unexpired lease at the time of assumption must be satisfied by the debtor either through a timely cure or through reasonable assurances of future payment (creating a new administrative obligation of the estate which is payable as a first priority expense of the bankruptcy estate, will not be discharged by confirmation of a chapter 11 plan, and will remain an obligation

---

[4] *Century Indem. Co. v. NGC Settlement Trust (In re Nat'l Gypsum Co.)*, 208 F.3d 498, 507 (5th Cir. 2000), *cert. denied*, 531 U.S. 871, 121 S.Ct. 172, 148 L.Ed.2d 117 (2000)).

[5] *Id.* at 507-508.  *See also See Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1281 (5th Cir. 1991) ("A party to a lease is considered a 'creditor' . . . only when the party has a claim against the estate that arises from rejection of a lease. If, however, the debtor expressly assumes a lease, the lessee has no 'claim' against the debtor. . . . .").

of the reorganized debtor).[6] Non-debtor parties to executory contracts and unexpired leases must be made whole as part of the assumption.[7] If a debtor intends to assume an unexpired lease, there must be actual notice to a counterparty of: (a) the debtor's intention, and (b) the opportunity to object to the assumption and to assert a "cure" amount for any defaults or pecuniary losses thereunder.[8] In a Chapter 11 case, the debtor-in-possession may, subject to Bankruptcy Code section 365, provide in a *plan* for the assumption or rejection of any unexpired lease not previously rejected (such as Placid did here).[9] In such situations, the requisite bankruptcy court approval for assumption or rejection must appear as part of the plan-confirmation, presumably in the confirmation order.[10]

The only other possibility when there has neither been assumption or rejection (both requiring actual notice) is if there is a mere "ride through" of an unexpired lease, in which case no claim associated with the lease will be discharged.[11] In summary, and as will be further explained herein, one or the other happened here—either assumption or "ride through" of the 20-Acre Surface Lease—since Placid continued operating on the underlying real property for approximately three years post-confirmation. Neither the assumption scenario nor the "ride

---

[6] *Nat'l Gypsum* at 508 (and citations therein).

[7] *Id.* at n.9.

[8] *See, e.g.*, 11 U.S.C. § 365(b); Fed. R. Bankr. Proc. 6006. *See also*, *Nat'l Gypsum* at 513.

[9] 11 U.S.C. § 1123(b)(2).

[10] *Nat'l Gypsum* at 512-514.

[11] *Id.* at n.7 ("If an executory contract is neither assumed nor rejected, it will "ride through" the proceedings and be binding on the debtor even after a discharge is granted, thus allowing the non-debtor's claim to survive the bankruptcy") (citing *Federal's, Inc. v. Edmonton Inv. Co.*, 555 F.2d 577, 579 (6th Cir. 1977)). *See also In re O'Connor*, 258 F.3d 392 (2001) (citing *In re Day*, 208 B.R. 358, 368 (Bankr.E.D.Pa.1997) ("It has long been the rule in bankruptcy that an executory contract that is neither assumed nor rejected continues in place between the parties, passing through the bankruptcy to the reorganized debtor."); *Polysat, Inc. v. Union Tank Car Co. (In re Polysat, Inc.)*, 152 B.R. 886, 890 (Bankr.E.D.Pa.1993) ("In a chapter 11 case, where a debtor has failed to expressly assume or reject a[n] ... executory contract, that ... contract will be unaffected by the bankruptcy filing"); 3 COLLIER ON BANKRUPTCY, ¶ 365.04[2][d](15th ed. rev.2001) ("If the debtor fails either to assume or reject a contract by separate order or in its plan, it appears that the contract would continue in existence... [I]f the debtor continues operating, arguably the contract passes through the bankruptcy and remains a liability of the reorganized entity."); 7 COLLIER ON BANKRUPTCY, ¶ 1123.02[2] (plan may provide for assumption of executory contract, or "the contract may 'ride through' the plan without being affected").

through" scenario results in discharged claims relating to the 20-Acre Surface Lease (and operations and activities occurring pursuant to that lease).

Based on the undisputed summary judgment evidence, this court has determined that Avalon is entitled to summary judgment that its claims against Placid pertaining to the 20-Acre Surface Lease (and operations and activities occurring pursuant to that lease) were not discharged since: (a) Avalon's predecessor was a counterparty to an unexpired nonresidential real property lease, at the time of the filing of Placid's Bankruptcy Case; and (b) it did not receive actual notice of Placid's intention to assume the lease, the deadline for objections to assumption of unexpired leases, or the deadline for filing cure amounts related thereto.

To be clear, **this pertains only to Avalon's claims relating to the 20-Acre Surface Lease** (i.e., claims relating to or stemming from the 20-Acre Surface Lease) and **not** to any other potential claims of Avalon against Placid, including but not limited to claims relating to a 1962 surface lease pertaining to a 4.412 acre parcel of land in St. Mary Parish, Louisiana (henceforth defined as the "4.412-Acre Surface Lease"); any oil, gas, and mineral leases involving Placid; any joint operating agreements involving Placid—all of which, by agreement of the parties, were discharged by Placid's Plan and Confirmation Order.[12]

## II.    JURISDICTION

This court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. § 1334(b).[13]  This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).  The parties have consented

---

[12] *See Agreed Order Regarding Litigation Claims*, DE # 95, entered November 16, 2021, in the Adversary Proceeding.
[13] While the Adversary Proceeding involves a plaintiff whose bankruptcy case ended many, many years ago, the Fifth Circuit has concluded in different contexts over the years that bankruptcy subject matter jurisdiction remains post-confirmation, and even after a bankruptcy case is closed, for such matters as enforcing/interpreting the scope of a debtor's discharge order and addressing alleged violations of it. *See, e.g., Bradley v. Barnes (In re Bradley)*, 989 F.2d 802 (5th Cir. 1993).

to bankruptcy court adjudication of their dispute regarding the scope and extent of Placid's discharge in its prior Bankruptcy Case.

## III.    THE UNDISPUTED AND MATERIAL FACTS

As earlier alluded to, Placid filed bankruptcy on August 29, 1986 (the "Petition Date"). Placid is an oil and gas company that was headquartered in Dallas, Texas.  A steep drop in the price of oil in the mid-1980s interfered with Placid's ability to pay its debts and ultimately precipitated the bankruptcy filing.  On September 30, 1988, Placid confirmed its Plan (the Fourth Amended Plan of Reorganization).  The Order confirming the Plan (the "Confirmation Order") provided that all claims against Placid that arose on or before September 30, 1988 (the confirmation date), were forever discharged except for the Reorganized Debtor's obligations under the Plan (the "Discharge").  The Confirmation Order also prohibited claimants from pursuing the Reorganized Debtor to enforce any claims that fell within the scope of the Discharge (the "Discharge Injunction").  This court reopened the Placid Bankruptcy Case on January 21, 2009, at Placid's request, so that it could file adversary proceedings seeking determinations as to whether numerous post-confirmation tort claims being asserted against it were discharged by the Confirmation Order.

The St. Mary Parish Surface Leases.  In this Adversary Proceeding, the relevant and material facts begin in the year 1962.  On October 12, 1962, a real property owner of certain land in St. Mary Parish, Louisiana ("St. Mary Parish Property") entered into two "Contract[s] of Lease" that were surface leases (the "Two Surface Leases"), as well as a right-of-way easement to the St. Mary Parish Property.  The Two Surface Leases and the easement were recorded in the public conveyance records of St. Mary Parish, Louisiana.  One of the Two Surface Leases concerned a 4.412-acre parcel of land (the "4.412 Surface Acre Lease"), recorded in Book 12-K, Entry No.

115,935 of the Conveyance Records of St. Mary Parish, Louisiana, and the other concerned a 20-acre parcel of land (the "20-Acre Surface Lease"), recorded in Book 12-K, Entry No. 115,936, as amended by instrument dated April 14, 1965, recorded in Book 13-R, Entry No. 125,458 of the Conveyance Records of St. Mary Parish, Louisiana.[14]  The lessor on the Two Surface Leases was the predecessor-in-interest to Avalon (Mrs. Ara Bateman Zenor, *et al.*; hereinafter "Avalon's Predecessor" or sometimes "Zenor/Original Lessor").[15]  The lessee on the Two Surface Leases was a well-known former Texas oil man named E. Cockrell, Jr. ("Cockrell/Original Lessee").  The Two Surface Leases were each for a one-year term, renewable for a period of 59 years.  The purpose of the Two Surface Leases was "for all purposes necessary for or relating to the transportation, storage, use, disposition, absorption, shipping, cracking, extracting, severing, treating, processing, and handling of oil, gas, or other hydrocarbons, water, or other products, regardless of where produced, including but not limited to the right of the Lessee, his heirs, successors, assigns, and sublessees to construct improvements and structures . . . ."[16]  There were various obligations on the part of Cockrell/Original Lessee, including the obligation upon termination "to remove from the leased premises all improvements" within one year,[17] and indemnification obligations for claims of damages that might arise out of Cockrell/Original

---

[14] The easement was recorded at Book-12, Entry No. 115,934, Conveyance Records of St. Mary Parish, Louisiana.

[15] Avalon, the defendant herein, was formed by the granddaughter of Zenor/Original Lessor (the granddaughter was named Maria T. Guarisco), as a holding company for the property interests bequeathed to her by her family.

[16] Pl. Ex. M, Appx. 1478. Note: Placid's summary judgment evidence will be referred to as "Pl. Ex. __, Appx. __" or "Pl. Supp. Ex. __, Appx. __." Placid's appendix appears at DE # 57, and its supplemental appendix appears at DE # 73. Avalon's summary judgment evidence comes from three sources: two declarations with attached exhibits and ten additional exhibits attached to *Avalon's Response to Placid's Motion for Summary Judgment.* They are as follows: (i) *Declaration of Leah C. Poole in Support of Avalon's Motion for Summary Judgment or Alternatively Discretionary Abstention* (the "Poole Declaration") includes 15 exhibits and appears at DE # 53; (ii) *Declaration of Douglas S. Draper in Support of Avalon's Motion for Summary Judgment or Alternatively Discretionary Abstention* (the "Draper Declaration") includes 9 exhibits and appears at DE # 55; (iii) Avalon's *Response Opposed to Placid's Motion for Summary Judgment* includes 10 exhibits and appears a DE # 74.  Avalon's summary judgment evidence will be referred to as "Def. Poole/Draper/Resp. Ex. __, pp. __."

[17] *Id*. at Appx. 1479.

Lessee's activities.[18] Significantly, both Cockrell/Original Lessee and Zenor/Original Lessor had rights to assign or sublease, in whole or in part, their rights under the Two Surface Leases "and the provisions [of the Two Surface Leases] shall extend to the heirs, successors, assigns, and sublessees of the parties hereto."[19] "It is understood and agreed that the word 'Lessee' as used herein, includes the heirs, successors, assigns and sublessees of E. Cockrell, Jr."[20] Further, to be clear, it appears that another party already possessed an oil and gas mineral lease on the St. Mary Parish Property, since the year 1957, that was unaffected by the Two Surface Leases.[21] So, to reiterate, these Two Surface Leases from the year 1962 were ***not mineral leases***—although they contemplated surface activities that involved oil and gas services.

<u>The Assignment Agreement with regard to the Two Surface Leases</u>. On June 10, 1965, Cockrell/Original Lessee executed a two-page agreement with Placid entitled "Assignment of Interest in Leases and Right of Way" (the "Assignment Agreement"). Like the Two Surface Leases, this document was also recorded in the public conveyance records of St. Mary Parish, Louisiana, at Book 19-R, Entry No. 165803, Folio 751 (May 28, 1976). The Assignment Agreement cross-references the Two Surface Leases, including where they are publicly recorded, the identity of the lessor (i.e., Zenor/Original Lessor), and a legal description of the St. Mary Parish Property. In the Assignment Agreement, Cockrell/Original Lessee did "GRANT, ASSIGN, and CONVEY unto Placid Oil Company," as "Assignee" an "undivided and one-half (1/2) of Assignor's right, title, and interest in and to" the Two Surface Leases and the related easement.[22] The short document further states: "This Assignment is subject to the terms, conditions, and

---

[18] Pl. Ex. M, Appx. 1479.
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] Pl. Ex. N, Appx. 1882.

provisions of the aforementioned leases and right of way-easement; and Assignee, by the acceptance hereof, expressly agrees to assume the covenants and obligations of said instruments to the extent of the interests acquired hereunder."[23]

Placid's Activities on the St. Mary Parish Property. Placid thereafter constructed on the St. Mary Parish Property two natural gas processing plants (the parties refer to these as "Patterson I," constructed in 1967, and "Patterson II," constructed in 1975 or 1976; collectively, the "Patterson Gas Plants"), intended for removal of condensates (natural gas liquids) and excess water from produced natural gas streams and to return the processed gas to a pipeline system for distribution. In connection with Patterson I, Placid also excavated a 75 x 75 square foot pit to be used for disposal purposes (the "Pit").

Placid eventually ceased most gas processing operations at Patterson I several years ***before the Petition Date*** (in 1982). Also, by an agreement dated July 19, 1982, the successors-in-interest to Cockrell/Original Lessee (Mr. Cockrell had died, by this point) and Placid, released any interest in the 4.412-Acre Surface Lease to the successor-in-interest to Zenor/Original Lessor (who had also died, by this point). The agreement was called "Release of Lease Contract" and was signed by the successor-in-interest to Zenor/Original Lessor; also, by the successors-in-interest to Cockrell/Original Lessee; and, also, by Placid. All parties agree that this document released any claims that Avalon or its predecessors-in-interest might have had with regard to the 4.412-Acre Surface Lease. To reiterate, any claims relating to the 4.412-acre parcel that was subject to the 4.412-Acre Surface Lease would have been prepetition claims that were released approximately four years before Placid's Bankruptcy Case was filed.

---

[23] Pl. Ex. N, Appx. 1882.

Placid closed and remediated the Pit *during* the Bankruptcy Case (in 1988), on the eve of confirmation. The Pit apparently had been used only in connection with Patterson I.

Placid kept operating Patterson II until Placid sold its interest in it *after* the Bankruptcy Case was closed (in 1991).

It is undisputed that Placid had no oil, gas, or mineral leases on any portion of the St. Mary Parish Property and never operated any oil or gas well thereon. Placid was a mineral lessee on nearby lands and participated in joint operating agreements with nearby lessees and, at different times in the past, on portions of the St. Mary Parish Property on which Cockrell/Original Lessee was operator (with regard to these joint operating agreements, production had ended prepetition).

Avalon (as successor-in-interest to the Zenor/Original Lessor) is now alleging environmental contamination claims on the St. Mary Parish Property. Avalon states that it first became aware of these claims in the year 2019.[24]

Placid's Bankruptcy Notices and Case Events. After Placid commenced its Bankruptcy Case, soon thereafter, on November 19, 1986, the court entered an Order Setting Bar Date,[25] which set January 31, 1987, as the bar date for potential creditors to file prepetition claims. Placid had massive operations and potentially unknown creditors far and wide. Thus, on three occasions (on January 2, 1987, January 9, 1987, and January 16, 1987), a Notice of Bar Date was published in the WALL STREET JOURNAL (the "Publication Notices"), a newspaper of national circulation that was available in Louisiana. On September 30, 1988, Placid confirmed its Plan. It is undisputed that Avalon's Predecessor(s) did not receive *actual* notice of the Bankruptcy Case and did not file a proof of claim or otherwise participate in the Bankruptcy Case.

---

[24] Pl. Ex. BB, Appx. 3017.

[25] Docket number 1184 in the Bankruptcy Case. Hereon, docket entries in the Adversary Proceeding will be cited as "DE # __" because all entries relate to the same adversary proceeding and are accessible through the CM/ECF system maintained by the Bankruptcy Clerk.

Avalon has recently sued Placid and many other gas plant operators in Louisiana state court for damages related to environmental contamination that allegedly occurred on the St. Mary Parish Property. Its claims are based on breaches of contract, tort, and several provisions of the Louisiana Civil Code and Mineral Code.[26] The alleged claims may fit into three distinct time frames: (i) prepetition claims, (ii) postpetition and pre-confirmation claims, and (iii) post-confirmation claims. To address the cross motions for summary judgment before it, the court need not determine the outcome of Avalon's state court action on its merits. Instead, the question is whether Avalon's state court claims, if meritorious, are subject to Placid's Discharge and Discharge Injunction.

The undisputed facts are further reiterated and elaborated upon in the timeline below.

| | |
|---|---|
| 1936 | Placid Oil was founded. |
| October 12, 1962 | Avalon's Predecessor, Zenor/Original Lessor, leased the following two parcels of land to Cockrell/Original Lessee, pursuant to the Two Surface Leases, as well as a right-of-way easement. These are specifically defined as follows: |

- (1) a 4.412-acre parcel for use as a staging point and boat dock (the "4.412-Acre Surface Lease");
- (2) a 20-acre parcel for natural gas processing ("Patterson Gas Plant Site"), on which the Patterson gas plants operated (the "20-Acre Surface Lease); and
- (3) a right of way to construct and operate the natural gas processing facilities (the "Right of Way").[27]

| | |
|---|---|
| June 10, 1965 | Placid and Cockrell/Original Lessee executed the Assignment Agreement wherein Cockrell/Original Lessee transferred to Placid an undivided 50% interest in the 4.412-Acre Surface Lease, the 20-Acre Surface Lease, and the Right of Way.[28] The Assignment Agreement was a single document. |
| 1967 | Placid constructed Patterson I, a natural gas plant, on a portion of the Patterson Gas Plant Site. Patterson I included a 75 x 75 evaporation pit (the Pit) on the northern end of the property. The Two Surface Leases (i.e., the 20-Acre Surface Lease, in particular)—and, therefore, the Assignment |

---

[26] *See Avalon's Third Supplemental and Amended Petition for Damages*, Pl. Ex. L, Appx 1338-1476.
[27] Pl. Ex. M, Appx. 1477-1481.
[28] Pl. Ex. N, Appx. 1482-1484.

|  | Agreement by reference—authorized the construction of the plants and the Pit.[29] |
|---|---|
| 1976 | Placid constructed Patterson II on the Patterson Gas Plant Site.[30] |
| 1979 | Patterson II began production.[31] |
| July 19, 1982 | Placid, the successors-in-interest to Cockrell/Original Lessee, and the successor-in-interest to Zenor/Original Lessor (i.e., a granddaughter of Zenor named Ms. Maria Guarisco, who is likewise Avalon's Predecessor) executed a "Release of Lease Contract"[32] pertaining to the 4.412-Acre Surface Lease. |
| August 9, 1982 | Patterson I ceased its gas processing operations. The facility continued to be used as a gas dehydration, storage, and sales facility for some unspecified period of time prepetition.[33] |
| August 29, 1986 | Placid filed for bankruptcy. |
| November 1986 | The bankruptcy court entered an Order Setting Bar Date for the filing of prepetition claims.[34] As is normally the case, the order did not mention any deadlines relating to administrative expense claims, claims based on Placid's rejection or assumption of executory contracts, or Placid's plan of reorganization. |
| January 2, 9, and 16, 1987 | The Order Setting Bar Date was published in the WALL STREET JOURNAL, a newspaper of national circulation that was available in Louisiana.[35] |
| January 31, 1987 | The bar date for the filing prepetition claims. |
| August 1–5, 1988 | Placid backfilled the Pit.[36] |
| August 19, 1988 | Placid filed its Plan.[37] Article IX of the Plan contained a provision that states, "All Executory Contracts that have not as of the Confirmation Date been rejected shall be assumed as of the Confirmation Date." The Plan in |

---

[29] Pl. Ex. A, Appx. 0004; Pl. Ex. S, Appx. 1676; Pl. Ex. Q, Appx. 1496; Pl. Ex. M, Appx 1478; Pl. Ex. N, Appx. 1482-1484.
[30] Pl. Ex. S, Appx. 1675.
[31] *Id.*
[32] Pl. Ex. P, Appx. 1494-1506.
[33] Pl. Ex. A, Appx. 0005; Pl. Ex. O, Appx. 1485-1488; Pl. Ex. S, Appx. 1675.
[34] Pl. Ex. C, Appx. 0887.
[35] Pl. Ex. E, Appx. 0892-0893.
[36] Pl. Ex. Q, Appx. 1497-1506; Pl. Ex. S, pp.14, Appx. 1685.
[37] Pl. Ex. G, Appx. 0896-0965.

the same Article contains bar dates for the filing of "administrative claims" "rejection claims," "cure claims," and "deficiency claims."[38]

| September 30, 1988 | Court entered the Confirmation Order confirming the Plan.[39]  The Order only referenced "bar dates" for the filing of "administrative claims," "rejection claims," and "deficiency claims."<br>▪ The Certificate of Service in connection with the Confirmation Order reflected no service of the Confirmation Order on Cockrell/Original Lessee's successors-in-interest or on Avalon's Predecessors. |
| --- | --- |
| December 29, 1988 | The bar date to file postpetition administrative expense claims (90 days after confirmation). |
| October 29, 1990 | The Louisiana Department of Natural Resources, Office of Conservation issued a Production Pit Report noting that the Pit had been closed and backfilled in compliance with state regulations.  The results of the sampling related to the report are dated October 31, 1988.[40] |
| December 18, 1990 | Avalon Plantation, Inc. (now known as Avalon Farm, Inc.), the defendant was formed by the granddaughter of Zenor/Original Lessor (granddaughter was named Maria T. Guarisco), as a holding company for the property interests bequeathed to her by her family.[41] |
| March 1, 1991 | Placid sold its interest in the 20-Acre Surface Lease (i.e., Patterson Gas Plant Site) to Torch Operating Company.[42] |
| May 1, 1991 | Placid sold all remaining assets in St. Mary Parish to South Oak Production Company, Cholla Resources, Inc., and Las Colinas Energy Company.[43] |
| December 31, 1994 | Placid became a wholly owned subsidiary of Occidental Petroleum Corporation.[44] |
| Nov. & Dec., 1995 | C-K Environmental conducted an environmental assessment of the Patterson Gas Plant Site on behalf of the operator at the time, Norcen Explorer, Inc.[45] |
| April 1996 | The Louisiana Department of Environmental Quality reviewed the documents evidencing the Pit's closure (which closed in 1988).[46] |

[38] See Pl. Ex. G, Appx. 0896-0965.
[39] Pl. Ex. I, Appx. 1092-1103.
[40] Def. Poole Ex. 14, attachments G and H.
[41] See Def. Resp. Ex. 8. pp. 4.
[42] Pl. Ex. A, Appx. 0005; Pl. Ex. R, Appx. 1509-10, 1650-1666.
[43] Pl. Ex. R, Appx. 1509, 1545-1559.
[44] Pl. Ex. A, Appx. 0002.
[45] Pl. Ex. S and T, Appx. 1667-1980.
[46] Pl. Ex. Q, Appx. 1496; Pl. Ex. AA, 2364-65.

| April 7, 1997 | The Bankruptcy Case was closed.[47] |
|---|---|
| January 21, 2009 | The bankruptcy court reopened the Bankruptcy Case.[48] |
| July 19, 2018 | Avalon sued several oil and gas companies in Louisiana State Court.[49] |
| October 9, 2019 | Avalon allegedly first learned that it had a claim against Placid.[50] |
| September 3, 2020 | Avalon filed its Second Supplemental and Amended Petition in Louisiana State Court, adding Placid as an additional defendant in Avalon's lawsuit against various oil and gas companies.[51] |
| November 12, 2020 | Placid initiated this Adversary Proceeding. |
| April 22, 2021 | Avalon filed its Third Supplemental and Amended Petition for Damages clarifying that it does not pursue or allege any claims that have been discharged in bankruptcy.[52] |
| November 2, 2021 | The bankruptcy court held a hearing on Placid's and Avalon's motions for summary judgment. |
| November 16, 2021 | The court entered an agreed order limiting the claims in this Adversary Proceeding.[53] |

## IV.    SUMMARY JUDGMENT STANDARD

A movant is entitled to summary judgment if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.[54]  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence

---

[47] Pl. Ex. A, Appx. 0004.
[48] DE # 4643 in the Bankruptcy Case.
[49] *See Avalon's Petition for Damages*, Pl. Ex. J, Appx. 1104-1181.
[50] Pl. Ex. BB, Appx. 3017.
[51] *See Avalon's Second Supplemental and Amended Petition for Damages*, Pl. Ex. K Appx. 1182-1337.
[52] *See Avalon's Third Supplemental and Amended Petition for Damages*, Pl. Appx. 1338-1476.
[53] *Agreed Order Regarding Certain Litigation Claims*, DE # 95.
[54] Fed. R. Civ. P. 56(a).

of a genuine issue of material fact."[55] The movant can meet this burden by presenting evidence showing there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.[56] Once the movant has done so, the burden shifts to the non-moving party to show that a genuine issue of fact remains.[57] The respondent may not rest on mere allegations or denials in its pleadings. It must set forth specific evidence in support.[58] There is no genuine issue of material fact unless there is sufficient evidence favoring the non-moving party for the court or jury to return a verdict for that party at trial.[59]

## V.    ANALYSIS

### A.    Nature of the Assignment Agreement.

The first question in this Adversary Proceeding is what was the legal nature of the Assignment Agreement, and—while not signed by Avalon's Predecessor (i.e., Zenor/Original Lessor)—did it create privity between Placid and Avalon's Predecessor (i.e., Zenor/Original Lessor)?  In other words, was it a true assignment or a sublease?  If the Assignment Agreement was truly an assignment (as opposed to a sublease) then contractual privity existed between Avalon's Predecessor and Placid,[60] and this would have entitled Avalon's Predecessor to actual notice of Placid's intention under its Plan to assume all executory contracts not already rejected

---

[55] *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

[56] *Celotex,* 477 U.S. at 322-323.

[57] *Beard v. Banks,* 548 U.S. 521, 529, (2006).

[58] *Macris v. Saxton (In re Jerry Dean Saxton, Katie Elizabeth Saxton, American Equities Management, LLC),* 2011 Bankr. LEXIS 2256 at *17 (Bankr. N.D. Tex. 2011) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505 (1986)); and *Al-Zubaidy v. TEK Industries, Inc.,* 406 F.3d 1030, 1036 (8th Cir. 2005) ("Evidence, not contentions, avoids summary judgment.").

[59] *Macris, 2011 Bankr.* LEXIS 2256 at *17 (citing *Anderson,* 477 U.S. at 249).

[60] *See Pine Tree Associates v. Subway Restaurants, Inc.,* 93-603, 643 So.2d 1271, 1275 (La.App. 5 Cir. 9/14/94), *writs denied* 647 So.2d 1120 (La. 1994) *and Dore Energy Corp. v. Carter-Langham, Inc.,* 2008-645, 997 So.2d 826, 829 (3d Cir. 2008).

and of the deadline under the Plan to file "cure" claims associated with assumed contracts.[61]  Recall that Article IX of Placid's Plan contained a provision that stated, "All Executory Contracts that have not as of the Confirmation Date been rejected shall be assumed as of the Confirmation Date." The Plan in the same Article contained deadlines for the filing of "administrative claims," "rejection claims," "cure claims," and "deficiency claims."[62]

The court determines that the undisputed summary judgment evidence establishes, as a matter of law, that the Assignment Agreement between Cockrell/Original Lessee and Placid was, indeed, an assignment (as the document's title indicates) of a one-half, undivided interest in the Two Surface Leases—it was not a sublease between Cockrell/Original Lessee and Placid, as Placid has argued.  The Assignment Agreement is not ambiguous on this point, and Louisiana case law does not point to it being a sublease.  Therefore, Avalon's Predecessor (i.e., Zenor/Original Lessor) was Placid's lessor and was entitled to actual notice of Placid's intent to assume the 20-Acre Surface Lease, through the Placid Plan.  The question of whether Avalon's Predecessor (i.e., Zenor/Original Lessor) was a "known" creditor to Placid misses the point.  The ongoing lessor-lessee relationship (i.e., the contractual privity) between Placid and Avalon's Predecessor during the Bankruptcy Case distinguishes the present case from other cases cited by Placid where creditors asserted belated environmental damages claims against a debtor and the debtor successfully argued that such claimants were unknown creditors.

Revisiting the details surrounding the Assignment Agreement, on October 12, 1962, Avalon's Predecessor (i.e., Zenor/Original Lessor) and Cockrell/Original Lessee executed the Two

---

[61] Section 9.1 of the Debtor's Plan provides that all "Executory Contracts as of the Confirmation Date that have not been rejected shall be assumed as of the Confirmation Date."  Section 9.2 of the Plan asserts that Placid will cure all defaults.  The section, however, requires that creditors whose contracts are assumed must file a proof of claim within thirty (30) days of such assumption.

[62] *See Id.*

Surface Leases. The court will focus on the 20-Acre Surface Lease, since the 4.412-Acre Surface Lease was released prepetition and is not at issue in this Adversary Proceeding. Article X of the 20-Acre Surface Lease provided that the word "Lessee" includes the heirs, successors, assigns, and subleases of Cockrell/Original Lessee.[63] The 20-Acre Surface Lease provided for a one-year term with the option to renew for 59 successive one-year renewals, with the renewal for each year evidenced by a payment of the specified rent.[64] The 20-Acre Gas Plant Lease granted no rights with respect to minerals. It also allowed Cockrell/Original Lessee to assign or sublease the 20-Acre Surface Lease.

Approximately three years later, in June of 1965, Cockrell/Original Lessee executed with Placid the Assignment Agreement purporting to transfer an undivided 50% interest in the 20-Acre Surface Lease to Placid, for the purpose of building and operating a gas plant(s). The operative portion of the Assignment Agreement provides that Cockrell/Original Lessee "does hereby GRANT, ASSIGN, and CONVEY unto [Placid] . . . , hereinafter called 'Assignee,' its successors, sublessees and assigns, . . . an undivided one-half (1/2) of Assignor's right, title, and interest in and to the following leases covering land situated in St. Mary Parish, Louisiana. . . ."[65] Additionally, the agreement provides that Placid assumes the obligations of Cockrell/Original Lessee to the lessor to the extent of its interests:

> This Assignment is subject to the terms, conditions and provisions of the aforementioned leases and right of way-easement grant; and Assignee, by the acceptance hereof, expressly agrees to assume the covenants and obligations of said instruments to the extent of the interests acquired hereunder.[66]

---

[63] *See* Def. Poole Ex. 3.
[64] *Id.*
[65] *See* Def. Poole Ex. 4, pp. 1.
[66] *Id.*, pp. 2.

Avalon's predecessor-in-interest's signature is absent from the Assignment Agreement (its consent to assignment or sublease was not needed under the Two Surface Leases), but the first numbered paragraph expressly acknowledges Avalon's Predecessor, Zenor/Original Lessor.[67]

The court will examine the language of the Assignment Agreement using the applicable standards of contract construction under Louisiana law where contracts are read for their plain meaning.[68]

> [U]nder Louisiana law, when the words of the contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent, and [t]his established rule of strict construction does not allow the parties to create an ambiguity where none exists and does not authorize courts to create new contractual obligations where the language of the written document clearly expresses the intent of the parties.[69]

The Assignment Agreement's title and its defined terms certainly indicate that the agreement is an assignment. The title reads "Assignment of Interest in Leases and Right of Way,"[70] and the agreement defines Cockrell/Original Lessee as "Assignor" and Placid as "Assignee."[71] However, under Louisiana law, the character of a document is determined by the document's substance rather than its title.[72] Thus, the title of the document and its defined terms are not determinative, but they are suggestive, especially considering the parties' sophistication. The court is inclined to honor the language chosen by the parties, but it will next consider the legal effect of the Assignment Agreement's provisions.

---

[67] *See* Def. Poole Ex. 4, pp. 1.

[68] *In re Liljeberg Enterprises, Inc.*, 304 F.3d 410, 440 (5th Cir. 2002) (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Circle, Inc*., 915 F.2d 986, 989 (5th Cir. 1990)).

[69] *Id*. (internal quotation marks omitted) (quoting *Omnitech Int'l, Inc. v. Clorox Co.,* 11 F.3d 1316, 1326 (5th Cir. 1994).

[70] Def. Poole Ex. 4, pp. 1.

[71] *Id*.

[72] *Smith v. McKeller,* 638 So. 2d 1192, 1195 (La. App. 1st Cir. 6/24/94) ("The title affixed to a document does not, of itself, control its character. Instead, the character of a document is determined by examining the entire writing."); *See also, Smith v. Sun Oil Co.,* 116 So. 379, 380 (La. 1928).

Louisiana has a rich yet murky jurisprudence distinguishing assignments from subleases.[73] Under Louisiana law, the substantive distinction between an assignment and a sublease is whether the original lessee retains any rights in the leasehold after the contract with the assignee or sublessee is signed.[74] An original lessee may retain leasehold rights by imposing rent on a later transferee and by including conditional rights of reversion in the transfer agreement. The Louisiana Supreme Court articulated the rule in *Smith v. Sun Oil Co*., 116 So. 379 (La. 1928) (hereinafter "*Sun Oil*"), and Louisiana courts apply the rule notwithstanding language in an agreement that purportedly "grants, conveys, transfers and assigns" a lease.[75]

In *Sun Oil*, the Louisiana Supreme Court determined that a so-called assignment was actually a sublease. Sun Oil Company, the original lessee, transferred its leasehold interests to Elliott, the transferee, via a transfer agreement that appeared on its face to be an assignment. The Louisiana Supreme Court examined the transfer agreement's substance and held that certain provisions made it a sublease.

> The fact that the Sun Company, as sublessor, and Elliott, as sublessee, in their contract, used the words, "grant, convey, transfer and assign," did not, of itself, make the contract an assignment merely, or deprive it of the character of a sublease; for there were several stipulations in the contract which made it, essentially, a sublease, and not merely an assignment. Every sublease is, in a sense, an assignment, but every assignment of a lease is not a sublease.[76]

The "several stipulations in the contract" that made it a sublease included provisions where:

---

[73] For instance, in the context of the mineral rights, the official Comments to the Mineral Code recognize that the jurisprudential issues raised by the distinction between an assignment and a sublease were "vexing problems" that needed resolution. Comment, Article 127 of Mineral Code, La. R.S. 31:127.

[74] *See* Prior Louisiana Civil Code Article 2725 (now partially found within Civil Code Article 2713) in effect until 2004. *See also Smith v. Sun Oil Co*., 116 So. 379 (La. 1928) *and Broussard v. Hassie Hunt Trust*, 91 So. 2d 762, 764 (La. 1956) (*citing Bond v. Midstates Oil Corp*., 53 So. 2d 149, 153 (La. 1951)) ("An assignment has been differentiated from a sublease by this Court on many occasions, the distinction being that '* * *' in an assignment the original lessee transfers all of his rights in the lease; whereas in a sublease he retains some control or interest in it.'").

[75] *See Smith v. Sun Oil Co.*, 116 So. 379 (La. 1928) and *Prestridge v. Humble Oil & Ref. Co.,* 131 So. 2d 810, 823 (La. Ct. App. 1961).

[76] *Sun Oil*, 116 So. at 380.

(i) Sun Oil Company retained the right to receive an additional one-eight overriding royalty from any production on the premises in addition to the royalty owed to the original lessor, and

(ii) a provision that acted as a conditional right of reversion in the event that Elliott failed to develop the property within 30 days.[77]

The court determined that through these provisions, Sun Oil Company retained an interest in the original lease and imposed additional obligations on Elliott.

As to the first stipulation, the Louisiana Supreme Court considered the overriding royalty a form of rent between the original lessee and the transferee.[78] This rent was to be paid by Elliott to Sun Oil Company, and it was in addition to the royalty that served as the obligation under the original lease. As a later court pointed out, this analytical view comported with the three things "absolutely necessary" for a lease (or sublease) at the time: (1) the delivery of the use and enjoyment of a thing; (2) the rent; and (3) the parties' consent.[79] This additional rent mattered to the Louisiana Supreme Court. Interestingly, in a case decided three years after *Sun Oil*, the court held that a similar transfer agreement was an assignment instead of a sublease. In explaining the different outcome, the Louisiana Supreme Court pointed out that the transfer agreement did not provide for rent. The court indicated that if the transfer agreement required the payment of an overriding or excess royalty like in *Sun Oil*, then the agreement would have been a sublease instead.[80]

As to the second stipulation, the *Sun Oil* court observed that the transfer agreement included conditional rights of reversion to accomplish the transfer's purpose. Sun Oil Company

---

[77] *Id.* at 381 (La. 1928).

[78] "[I]n oil and gas leases, under the settled jurisprudence of this state, the payment of a royalty is the payment of rent, and is not the payment of a price for the oil or gas rights, as if they were sold." *Roberson v. Pioneer Gas Co.*, 137 So. 46, 48 (La. 1931) (citing cases).

[79] *Hoover Tree Farm, L.L.C. v. Goodrich Petroleum Co.*, 46,153 (La. App. 2 Cir. 3/23/11), 63 So. 3d 159, 173, *writ denied sub nom. Hoover Tree Farm, L.L.C. v. Goodrich Petroleum Co.*, 2011-1225 (La. 9/23/11), 69 So. 3d 1161, and *writ denied*, 2011-1236 (La. 9/23/11), 69 So. 3d 1162.

[80] *Roberson v. Pioneer Gas Co., 137 So. at 47 (citing cases).*

transferred its interest in the lease to obtain immediate development and production of minerals on the property. Immediate development was required to prevent forfeiture under the original lease. Hence, the transfer agreement required Elliott to drill within 30 days or else surrender his interest in the underlying Lease.

Based on *Sun Oil* and other Louisiana case law, Placid argues that the Assignment Agreement was a sublease as a matter of law because Cockrell/Original Lessee withheld two key rights: (1) the right to release acreage from the Two Surface Leases, and (2) the right to itself make the rental payments to the Zenor/Original Lessor.

First, it is true that, when assigning half of his interest in the Two Surface Leases to Placid, Cockrell/Original Lessee retained his absolute right to release acreage.[81] The 20-Acre Surface Lease provided Cockrell/Original Lessee with the right to release all or part of the 20 acres: "[Cockrell/]Lessee may at any time or times execute and deliver to [Zenor/Original] Lessor … a release or releases covering any portion or portions of the above described twenty (20) acres…"[82] However, the Assignment Agreement between Cockrell/Original Lessee and Placid limited both Cockrell/Original Lessee's and Placid's right to release acreage by requiring that the releasing party offer reassignment to non-releasing party first.

> If at any time either Assignor [Cockrell] or Assignee [Placid] does not elect to maintain his or its interest in either of said leases in force and effect, . . . and the other party does so elect and takes the necessary action to maintain said lease or leases in force and effect, . . . the non-electing party shall promptly execute and deliver to the other party a reassignment of his or its interest in such lease or leases …[83]

Thus, neither Placid nor Cockrell/Original Lessee obtained in the Assignment Agreement the unfettered right to release as provided to Cockrell/Original Lessee in the 20-Acre Surface Lease.

---

[81] *See* Section VII of the Lease, Pl. Ex. M, Appx. 1478.
[82] *Id.*
[83] Pl. Ex. N, Appx. 1483.

Rather, the Assignment Agreement created a new but *reciprocal* duty on both parties, consistent with joint ownership. If the Assignment Agreement was a sublease, this would be nonsensical.

Second, Placid argues that the fact that Cockrell/Original Lessee retained the responsibility for paying rent to the Zenor/Original Lessor means that the Assignment Agreement is a sublease as a matter of law. Cockrell/Original Lessee was the sole party responsible for paying rent under the 20-Acre Surface Lease.[84] Similarly, under the Assignment Agreement, Cockrell/Original Lessee remained the party responsible for paying rent to Zenor/Original Lessor. Placid characterizes this arrangement as tantamount to giving Cockrell/Original Lessee the ultimate choice to terminate the 20-Acre Surface Lease at any time (essentially, by not paying rent) without notifying Placid. Placid's characterization of this provision is a strange interpretation, given the inherently expensive and long-term gas plant project contemplated at the Patterson Gas Plant Site—one that required stability and longevity. Placid highlighted the following language in the Assignment Agreement:

> Any and all rentals paid on [the Lease] or any additional amounts which may be due by virtue of the terms of any of said instruments shall be paid by Assignor [Cockrell]…[85]

Avalon pointed out that the provision goes on to state:

> … ***but the amounts paid by Assignor shall be borne by Assignor and Assignee in proportion to their ownership***. Assignor [Cockrell] shall not be liable for failure to pay, or improper payment of, any rental or other amounts which may be due, because of clerical error, oversight, or otherwise, provided Assignor [Cockrell] shall have exercised good faith.[86]

Cockrell/Original Lessee is, indeed, the party responsible for making payments of rent to Zenor/Original Lessor, but the Assignment Agreement clearly divides the amounts owed equally

---

[84] Pl. Ex. M, Appx. 1477.
[85] Pl. Ex. N, Appx. 1483.
[86] *Id.* (emphasis added).

between Cockrell/Original Lessee and Placid based on their ***ownership*** interests. As discussed above, Placid agreed to assume the covenants and obligations of the Two Surface Leases, which included the obligation to pay rent. The court reads the above-quoted language as a payment mechanism consistent with an assumption of an interest in the underlying 20-Acre Surface Lease. It is not consistent with a sublease between Cockrell/Original Lessee and Placid which would have required an independent rent amount based on something other than an ownership interest. The language of the Assignment Agreement does not indicate that the word "ownership" means anything other than the plain definition of the word. This apparent inconsistency between the Assignment Agreement and the 20-Acre Surface Lease is consistent with joint ownership resulting from an assignment and not a sublease.

While these two rights—the right to release and the exclusive right to make rent payments—were altered by the Assignment Agreement, they were altered in a way that reflects joint ownership rather than a new sublessor-sublessee relationship. The court finds that the Assignment Agreement was an assignment of 50% of Cockrell/Original Lessee's interest in the 20-Acre Surface Lease to Placid. Therefore, Placid was a lessee of Avalon's Predecessor, Zenor/Original Lessor, and the two parties shared contractual privity. As such, Avalon's Predecessor was a counterparty to an unexpired lease with Placid.

The Fifth Circuit has made clear (if it was not already clear from Bankruptcy Code Sections 365(a), 1123(b)(2), and accompanying Bankruptcy Rules), that opposing parties to executory contracts and unexpired leases assumed through a bankruptcy plan are entitled to notice of a debtor's specific intent to assume the contract or lease. In *In re National Gypsum Co.*, the Fifth Circuit extensively addressed this topic and held that, when a debtor assumes executory contracts through a plan of reorganization, the debtor has a "responsibility to assure that the non-debtor party

was on notice of the debtor's specific intent to assume the contract."[87] It held that a counterparty to an executory contract would not be bound by a $0 cure amount for it used by the debtor in its plan, when the counterparty did not receive actual notice of the plan or the confirmation order. It did not matter that the opposing party had actual knowledge of the bankruptcy case. The Fifth Circuit based its holding on constitutional due process grounds rather than statutory grounds because "[n]otice as a procedural safeguard cannot expand or contract based solely upon the procedural choice of the debtor when the ramifications to the non-debtor party are no less severe."[88]

Again, here, the Plan provided that Placid assumed all executory contracts unless otherwise indicated, and it required Placid to cure any default, provided that the counterparty filed a proof of claim for their alleged cure amounts within 30 days.[89] In effect, if a counterparty to an executory contract or unexpired lease failed to file a proof of claim in the time allotted in the Plan, then that contract or lease was deemed assumed with no cure necessary. A review of the docket in the Placid Bankruptcy Case,[90] makes clear that Placid did not file or serve any specific notice of either rejection or assumption of the 20-Acre Surface Lease to Avalon's Predecessor. And it is undisputed that Avalon's Predecessor received no actual notice of any kind related to the Plan or the Confirmation Order (or of the Bankruptcy Case generally, for that matter). Avalon's Predecessor was not afforded the due process protection to which it was entitled as a counterparty to an unexpired lease—i.e., a lease that was very much still in place during the Bankruptcy Case.

---

[87] *Century Indem. Co. v. Nat'l Gypsum Co. Settlement Trust (Matter of Nat'l Gypsum Co.),* 208 F.3d 498, 513 (5th Cir.), *cert. denied*, 531 U.S. 871 (2000).
[88] *Id*. at 512.
[89] Article IX, Sections 9.1 and 9.2, Pl. Ex. G, Appx 0944-0945.
[90] DE ## 3107, 3108, 3109, and 3110.

A last point is worth making. It is certainly conceivable that the 20-Acre Surface Lease (i.e., Placid's interest/ownership therein) simply passed through the Bankruptcy Case unaffected, as opposed to being assumed. As mentioned earlier, the Plan, at Article IX, provided that: "All Executory Contracts that have not as of the Confirmation Date been rejected shall be assumed as of the Confirmation Date."[91] The Plan in the same Article contains bar dates for the filing of "administrative claims" "rejection claims," "cure claims," and "deficiency claims."[92] Not only did this provision technically not use the words "and unexpired real property leases," but—perhaps more importantly—neither the 20-Acre Surface Lease nor the Assignment Agreement, for that matter, were listed in Placid's Schedule of Executory Contracts and Leases. If "pass through" is the correct interpretation of what happened, Placid is still in the very same spot here. As noted earlier, the Fifth Circuit has recognized the "pass through" concept, where (a) an assumable executory contract is neither assumed nor rejected, and (b) the reorganized debtor continues to operate the debtor's pre-bankruptcy business.[93] When there is "pass through" (sometimes referred to as a "ride through"), any claims associated with the lease (prepetition, postpetition, post-confirmation) are unaffected by the discharge of bankruptcy.[94]

## B.     Known or Unknown Creditor?

---

[91] Pl. Ex. G, Appx. 0896-0965.

[92] See Id.

[93] In re O'Connor, 258 F.3d 392 (2001) (citing, among other authorities, In re Day, 208 B.R. 358, 368 Bankr.E.D.Pa.1997) ("It has long been the rule in bankruptcy that an executory contract that is neither assumed nor rejected continues in place between the parties, passing through the bankruptcy to the reorganized debtor."); Polysat, Inc. v. Union Tank Car Co. (In re Polysat, Inc.), 152 B.R. 886, 890 (Bankr.E.D.Pa.1993) ("In a chapter 11 case, where a debtor has failed to expressly assume or reject a[n] ... executory contract, that ... contract will be unaffected by the bankruptcy filing")).

[94] 3 COLLIER ON BANKRUPTCY, ¶ 365.04[2][d] (15th ed. rev.2001) ("If the debtor fails either to assume or reject a contract by separate order or in its plan, it appears that the contract would continue in existence... [I]f the debtor continues operating, arguably the contract passes through the bankruptcy and remains a liability of the reorganized entity."); 7 COLLIER ON BANKRUPTCY, ¶ 1123.02[2] (plan may provide for assumption of executory contract, or "the contract may 'ride through' the plan without being affected"). Further, in Nat'l Gypsum, the court noted: "If an executory contract is neither assumed nor rejected, it will 'ride through' the proceedings and be binding on the debtor even after a discharge is granted." Nat'l Gypsum, 208 F.3d at 504 n.4.

Having determined that Placid and Avalon's Predecessor were in privity on the 20-Acre Surface Lease, and that such lease was either assumed or rode through the Bankruptcy Case unaffected, is the analysis of "known" versus "unknown" creditors even necessary here? This court thinks not. "A party to a lease is considered a 'creditor' . . . only when the party has a claim against the estate that arises from rejection of a lease. If, however, the debtor expressly assumes a lease, the lessee has no 'claim' against the debtor. . . . ."[95] The court will go through the analysis in an abundance of caution—in case some higher court thinks it is needed.

Case law has defined a "known" creditor as one whose identity is either known or "reasonably ascertainable by the Debtor."[96] A "known" creditor generally must receive actual, written notice of bankruptcy proceedings in order for a bankruptcy discharge to apply to it.[97] An "unknown" creditor, on the other hand, is one whose "interests are either conjectural or future or, although they could be discovered upon investigation, do not in due course of business come to the knowledge" of the Debtor.[98] "For unknown claimants, notification by publication will generally suffice."[99]

As the Fifth Circuit has consistently emphasized, "known claimants must be reasonably ascertainable, not reasonably foreseeable."[100] In *Williams v. Placid Oil Co. (In re Placid Oil Co.)*, 753 F.3d 151 (5th Cir. 2014), the Fifth Circuit distinguished "reasonably ascertainable" creditors from those who are "merely foreseeable" in terms of whether or not the debtor possesses "specific

---

[95] *Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1281 (5th Cir. 1991).

[96] *Id*. (citing *Tulsa Professional Collection Serv., Inc. v. Pope*, 485 U.S. 478 (1988)).

[97] *Id*. at 345.

[98] *Mullane*, 339 U.S. at 317.

[99] *See, Chemetron Corp*., 72 F.3d at 346.

[100] *Williams v. Placid Oil Co. (In re Placid Oil Co.)*, 753 F.3d 151, 156 (5th Cir. 2014) (emphasis in original) (quoting *Chemetron Corp. v. Jones*, 72 F.3d 341, 348 (3d Cir. 1995)); *see also, Louisiana Dep't of Envtl. Quality v. Crystal Oil Co. (In re Crystal Oil Co.)*, 158 F.3d 291, 297 (5th Cir. 1998).

information" regarding an "actual injury suffered by the creditor."[101] The Fifth Circuit has explained: "At one extreme, the law does not require that a creditor serve upon the debtor a formal complaint in order to make himself 'reasonably ascertainable' or 'known.' However, at a minimum, the debtor must possess 'specific information' about a manifested injury, to make the claim more than merely foreseeable."[102]

The typical analysis in reported cases dealing with whether a creditor's claim was "known" or "unknown" usually involve significantly more "remoteness" than in the case at bar. For example, in both *Placid Oil Co. v. Shelton Property Rural Acreage, LLC,* 450 Fed. Appx. 323 (5th Cir. 2011) and *Placid Oil Company v. Cavenham Forest Industries, Inc*., 3:94-CV-2460-H (N.D. Tex. October 31, 1995), *former* lessors (under *mineral* leases) sued Placid post-confirmation for environmental damage to their respective properties. In both cases, neither Placid nor the lessor knew of the environmental contamination during the Bankruptcy Case. But, *unlike in the current situation with Avalon*, the leases had terminated long before the Petition Date, and it was undisputed that Placid had tens of thousands of other former lessors on mineral leases worldwide. In *Shelton* and *Cavenham*, the courts held that the lessors were "unknown" creditors and that the constructive notice posted in the WALL STREET JOURNAL was sufficient to discharge the prepetition environmental claims. The bankruptcy court in *Cavenham* found determinative the fact that neither party knew the claim's existence on the Petition Date. The district court agreed and added that even if the lessor was "known," to require Placid to provide notice to the entire class of former lessors would have been unreasonable under the circumstances under *Mullane*, the foundational

---

[101] *Id*.
[102] *Id*.

Supreme Court precedent for the notice requirement.[103] The court in *Shelton* held likewise for the same reasons.

In the present case, Placid and Avalon's Predecessor (like in *Shelton* and *Cavenham*) had no knowledge of the environmental claims on the Petition Date. However, unlike in *Shelton* and *Cavenham*, Placid was active on the 20-Acre Surface Lease throughout the bankruptcy case. The 20-Acre Surface Lease was not a mineral lease that was terminated long ago. The fact that the 20-Acre Surface Lease had not terminated prepetition is crucial. To be clear, Placid held a one-half interest in a very significant surface lease on which it was still openly and actively processing hydrocarbons and intended to continue operating post-confirmation. The underlying 20-Acre Surface Lease was recorded in public records and was referenced in the Placid Assignment Agreement. Avalon's Predecessor and its potential to have a claim had to be "known" to Placid.

To reiterate, this situation is different from the other Placid adversary proceedings that involved either claims that would have been either highly conjectural and speculative at the time of the Bankruptcy Case (such as the asbestos-exposure claimant in the *Williams* case) or whose claims were held by one of Placid's many former lessors on expired mineral leases. Ultimately, the fact that Avalon's Predecessor and Placid were parties to a still intact surface lease during the Bankruptcy Case deems the known/unknown question inapposite. Avalon's Predecessor should have been given actual notice and was not afforded an opportunity to protect its cure amounts from any defaults/losses (prepetition or postpetition) with regard to the 20-Acre Surface Lease. As such, the summary judgment evidence does not support a conclusion that Avalon's prepetition and postpetition claims relative to the 20-Acre Surface Lease were discharged as a matter of law.

**C.     Actual Versus Constructive Notice?**

---

[103]  *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 316-317 (1950).

Assuming this court is wrong and Avalon's Predecessor should be considered an "unknown" creditor here—such that a publication notice would generally suffice—there is still one last problem for Placid. The problem is Placid's failure to publish notice of **the Plan and the Order Confirming the Plan**, which prevented Avalon's Predecessor from receiving constructive notice of various deadlines germane to it—i.e., deadlines for objecting to assumption of its agreements or a cure amount associated with its agreements.

The typical analysis in reported cases dealing with whether a creditor's claim was discharged in a prior bankruptcy case focuses on creditors who had **prepetition** claims only (not creditors subject to an executory contract). It has long been a common practice for Chapter 11 debtors to attempt to preemptively avoid the potential for unknown creditors coming out of the woodwork post-confirmation by utilizing publication notices. This is done by publishing the claims bar date (as Placid did for prepetition claims only), and ideally by also publishing notice of the plan and confirmation order (which Placid did **not** do). These publication efforts to target unknown creditors with prepetition claims hopefully avoids the situation in which Placid now finds itself.

As earlier noted, Placid published in the WALL STREET JOURNAL between January 2 and 16, 1987, notice of the bar date for **prepetition unsecured claims**.[104] But there was never any publication notice of the administrative expense claim bar date, nor the Plan or Confirmation Order that reflected Placid's intentions regarding executory contracts, nor deadlines to object to assumption/rejection and assert cure amounts.

As noted earlier, in *In re National Gypsum Co.*, the Fifth Circuit held that, when a debtor assumes executory contracts through a plan of reorganization, the debtor has a "responsibility to

---

[104] Pl. Exs. D, F, and F, Appx. 0888-0895.

assure that the non-debtor party was on notice of the debtor's specific intent to assume the contract."[105]  It did not matter there that the opposing party had actual knowledge of the bankruptcy case.[106]

## VI.    CONCLUSION

Avalon's Predecessor was a counterparty to an unexpired lease (i.e., the 20-Acre Surface Lease) on which Placid was a party at the time of the filing of the Bankruptcy Case.  The 20-Acre Surface Lease was assumed in Placid's Plan.    Due to the lack of any notice to Avalon's Predecessor concerning the Plan, the Confirmation Order, what executory contracts were being assumed, and deadlines for asserting cure amounts—the court cannot conclude that Avalon's Predecessor had its claims relating to the 20-Acre Surface Lease discharged in the Bankruptcy Case.  Avalon's claims, if any, related to or stemming from the 20-Acre Surface Lease were not discharged in the Placid Bankruptcy Case.  The only alternative explanation is that the 20-Acre Surface Lease passed through the Bankruptcy Case unaffected, in which case all claims that might have arisen against Placid thereunder were not discharged.

Avalon should submit a Summary Judgment consistent with this Memorandum Opinion and Order.

### #### END OF MEMORANDUM OPINION AND ORDER ####

---

[105] *In re National Gypsum Co.*, 208 F.3d 498, 513 (5th Cir. 2000).
[106] *Id*. at 512.